UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES CULBERT,                    )
                                  )
                Plaintiff,        )
                                  )
        vs.                       )        10 C 3868
                                  )
HILTI, INC.,                      )
                                  )
                Defendant.        )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This case comes before the Court on Defendant Hilti, Inc.'s ("Hilti") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, the motion is granted.

## BACKGROUND[1]

**The Parties**

Hilti manufactures, markets, and sells tools and related products primarily to the commercial construction industry. Hilti showcases its products and answers consumers' questions through the use of "pro shops" located in Home Depot stores.

---

[1] Unless otherwise noted, the following facts are undisputed for purposes of summary judgment. Further, all statements in the parties' statements of undisputed facts are deemed admitted where the opposing party failed to state a valid evidentiary objection and purportedly disputed the statement without specifically citing an affidavit, the record, or other supporting material. *See* N.D. Ill. L.R. 56.1(b)(3)(B)-(C).

Each pro shop employs one or two pro shop consultants, who interact with Home Depot customers and encourage them to purchase Hilti's products.

In October 2000, Hilti hired Plaintiff James Culbert ("Culbert"), a forty-four year old African American, as a pro shop consultant and assigned him to the North Avenue Home Deport store in Chicago, Illinois. As a Hilti employee, Culbert understood that he should treat fellow employees with dignity and respect, abide by his supervisor's instructions, be courteous, act in a business-like manner, and not harass or intimidate co-workers.

**Culbert's Supervisor, Jennifer Perchenko**

Sometime before March, 1, 2006, Jennifer Perchenko ("Perchenko") was a Lead Pro Shop Consultant, an intermediary between Hilti's Regional Manager and the pro shop consultants. When Perchenko was the Lead Pro Shop Consultant, she and Culbert had a good working relationship. For instance, Perchenko occasionally brought muffins and coffee into work for Culbert. Additionally, Perchenko and Culbert exchanged going-away gifts around April 2004 when Hilti promoted Perchenko to a training position in Oklahoma. On March 1, 2006, Hilti promoted Perchenko to Regional Manager of the Midwest region and Perchenko became Culbert's supervisor. Perchenko was the Regional Manager of the Midwest region until November 30, 2008.

**Culbert's Performance and the 2006 Annual Evaluation**

From 2003 to 2005, Hilti's North Avenue Pro Shop exceeded forecasted sales and Perchenko attributed part of the success to Culbert. According to Perchenko, Culbert was knowledgeable about Hilti's products, understood contractors and their work, understood how Home Depot functioned, and was willing to work when needed. Culbert did not receive any written warnings during his first six years of employment with Hilti.

According to Perchenko, she visited Culbert at least once per month to provide feedback. Perchenko stated that, unlike the other pro shop consultants, Culbert refused to engage in mock role play so that she could provide feedback on his interaction with customers. Perchenko also allegedly encouraged Culbert to be more outgoing with customers and friendly with Hilti employees. In an affidavit, Culbert denies that he refused to participate in the mock role play in 2006 or that Perchenko approached him regarding his interaction with customers or co-workers.

On January 16, 2007, Perchenko and Culbert met at a coffee shop where Perchenko provided Culbert with his annual performance review (the "2006 Review"). According to Culbert, at the beginning of the meeting, Perchenko said to Culbert, "I don't want any of your bullshit. I'm not in the mood for it today."

In the 2006 Review, Perchenko positively commented on Culbert's inventory management, but criticized other aspects of his performance. Specifically,

- 3 -

Perchenko stated that Culbert did not communicate with his team members and failed to create two personal development targets. Perchenko also stated that Culbert's poor attitude towards change and working with others was the primary reason that the North Avenue store achieved only 80% of the forecasted sales in 2006. When given the opportunity to document his own assessment of his performance in 2006, Culbert rated himself as "below expectations" in the categories of "business targets," "development/core values targets," and "final assessment." Although Perchenko did not include her assessment of Culbert in those categories, she testified that she agreed with Culbert's assessment and considered his performance as "below expectations." The rating of "below expectations" was the lowest rating among the three ratings of "exceeds expectations," "meets expectations," and "below expectations."

For the "team member comments" section of the 2006 Review, Culbert wrote "no comments." Culbert admitted that he told Perchenko something along the lines of "just tell me what you want me to write on here and I will." Culbert acknowledged that Perchenko could have been insulted by his statement. Perchenko testified that she found Culbert's comment unprofessional and disrespectful.

**The January 16, 2007 Corrective Action Plan**

On January 16, 2007, the same day Perchenko gave Culbert his 2006 Review, Perchenko also provided Culbert with a Corrective Action Plan ("CAP"), outlining

perceived attitude and performance issues and the actions that Culbert was expected to take to correct such issues. In the January 2007 CAP, Perchenko criticized Culbert's sales performance for 2006 because he achieved only 80% of the planned sales. Four of the thirteen pro shops in the Midwest region finished 2006 below 80% of planned sales, but Perchenko did not issue written warnings to the pro shop consultants located in those pro shops.

In the January 2007 CAP, Perchenko also stated that other Hilti employees complained about their interactions with Culbert. Perchenko testified that she had a difficult time convincing employees to work at the North Avenue Pro Shop with Culbert. According to Perchenko, Culbert was unfriendly to her, his teammates, Hilti's corporate employees, and Home Depot's corporate employees at the North Avenue Pro Shop. According to the January 2007 CAP, Perchenko discussed Culbert's attitude with him on several occasions, but he continued to challenge directives from management. For example, Perchenko stated that Culbert was not receptive to her coaching on how to more effectively engage Home Depot customers. According to Perchenko, Culbert continually asked customers the yes or no question, "Can I help you?" Perchenko disfavored that question and had instructed her team to ask open-ended questions, such as, "What brings you into Home Depot?" and "What are you working on today?" Perchenko stated that Culbert's behavior impeded

Hilti's ability to achieve sales targets, provide customer service, and maintain a credible relationship with Home Depot's management.

As stated in the January 2007 CAP, Perchenko transferred Culbert to the Armitage Pro Shop, a location with fewer customers and no other pro shop consultants. Culbert had no problem with the transfer, since he received the same pay and health benefits and maintained the same responsibilities. The January 2007 CAP directed Culbert to immediately improve his overall behavior and maintain at least 90% of forecasted sales at the Armitage Pro Shop.

**The June 13, 2007 Corrective Action Plan**

According to Perchenko, Culbert's poor attitude and performance did not improve after he received the January 2007 CAP. On June 11, 2007, Perchenko e-mailed Chris Gilreath ("Gilreath"), Hilti's Human Resources Manager at the time, stating that Culbert's attitude and sales had briefly improved, but then became much worse. Perchenko stated that Culbert's behavior was unacceptable and that she planned to issue another CAP focusing on Culbert's attitude and communication. Perchenko stated that she would like to terminate Culbert even though she had no replacement. Perchenko also asked Gilreath what she could do to expedite the termination process because she felt certain that Culbert would not improve. Gilreath had sole authority to make termination decisions on behalf of Hilti and

declined to terminate Culbert's employment. Instead, Gilreath chose to give Culbert an opportunity to remedy his conduct and performance.

On June 13, 2007, after consulting with Gilreath, Perchenko issued Culbert a second CAP relating to his attitude and sales performance. In the June 2007 CAP, Perchenko noted that she had previously discussed these problems with Culbert but, in her opinion, Culbert had not made the necessary improvement. Regarding Culbert's sales performance, Perchenko stated that Culbert's sales performance was 67% of the forecasted sales, which was 23% less than his target, as set forth in the January 2007 CAP. Relating to Culbert's attitude, Perchenko described several alleged incidents occurring on February 6, 2007, May 9, 2007, and May 30, 2007. According to Perchenko, at a February 6, 2007 meeting, Culbert displayed a negative attitude in front of his teammates and appeared disinterested in presentations. Further, according to Perchenko, on May 9, 2007, she asked Culbert to stop unloading shelves on five separate occasions and Culbert refused. Finally, Ashley Joseph ("Joseph") allegedly told Perchenko that, on May 30, 2007, Culbert had agreed to meet her at an event at 6:00 a.m., but that he did not arrive until 7:15 a.m. Joseph also purportedly told Perchenko that Culbert did not call to explain that he was running late and did not apologize for making her wait. At his deposition, Culbert disputed the accuracy of the events as documented in the June 2007 CAP.

The June 2007 CAP also identified the corrective action expected of Culbert. Specifically, the CAP directed Culbert to consistently display a better attitude towards his role at Hilti and towards his Hilti teammates, and to meet his sales forecast of 90% by August 1, 2007. To improve Culbert's attitude, the CAP required Culbert to actively participate in team meetings and use effective communication skills when interacting with Perchenko and his Hilti teammates.

When handing the June 2007 CAP to Culbert, Perchenko told him that she believed he had a negative attitude towards her and his Hilti teammates. Upon receiving the CAP, Culbert raised his voice at Perchenko and used the word "bullshit." Culbert testified that he told Perchenko that she favored her "little white cronies." Further, according to Perchenko, Culbert picked up the papers and threw them on the floor. Perchenko then asked Culbert to leave the premises.

**Perchenko's Visit to the Armitage Pro Shop on September 18, 2007**

According to Culbert, Perchenko did not visit the Armitage Pro Shop after June 13, 2007, until September 18, 2007. During Perchenko's September 18, 2007 visit to the Armitage Pro Shop, Perchenko asked Culbert why he was never happy to see her. Culbert responded, "happy to see you? . . . every time I see you, you got a write-up in your hand. You probably got one in your hand now." Perchenko did not have a write-up in her hand. Further, according to Culbert, Perchenko told Culbert that he made her uncomfortable and when he asked how, she replied "you just do."

- 8 -

At some point, Culbert accused Perchenko of having an issue with black people and said that the only solution was for him to "act more white." Perchenko responded that she would contact human resources if Culbert felt race was an issue and Culbert agreed that she should do so. After parting ways, Perchenko called Gilreath to report the incident.

According to Hilti's written policy, Hilti must promptly address employee complaints. Hilti does not require that complaints of racial discrimination be in writing. Gilreath was responsible for investigating employee complaints. Other than speaking to Perchenko and reviewing e-mails from Perchenko, Gilreath did nothing to confirm the accuracy of the incidents with Culbert or investigate Culbert's claim of discrimination. Gilreath testified that he did not believe that Culbert was making a formal complaint of race discrimination.

On September 18, 2007, Perchenko sent Gilreath several e-mails. In one of the e-mails, Perchenko attached a summary of the incident which occurred earlier that day. Perchenko expressed her belief that Culbert would not improve his performance or attitude. Perchenko also mentioned that, as of September 18, 2007, Culbert's actual sales for the third quarter of 2007 were 79% of planned sales and Culbert's actual sales for the year 2007 were 72% of planned sales. As of September 18, 2007, the actual sales of several other pro shops for the third quarter of 2007 were as follows: Addison (83%); Cicero (76%); Niles (71%); North Avenue (65%);

and 47th and Western (70%). Perchenko explained that several of those pro shops had not met the planned sales for the third quarter of 2007 because the pro shops were either understaffed or lacked a pro shop consultant entirely. As to the Niles Pro Shop, Perchenko stated that the pro shop consultant, Jodie Broderick, had poor product knowledge and low confidence but that the pro shop became more successful after Jodie Broderick received additional guidance.

During a September 18, 2007 conversation with Gilreath, Perchenko once again asked Gilreath to terminate Culbert's employment, but Gilreath again declined. According to Gilreath and Perchenko, Gilreath asked Perchenko to evaluate Culbert's conduct towards Perchenko and the other employees at an upcoming breakfast meeting. Gilreath wanted to give Culbert every chance possible to turn his behavior around and accept coaching.

**Gilreath's Decision to Terminate Culbert's Employment**

On September 20, 2007, the pro shop consultants met for a breakfast team meeting. Perchenko claims that Culbert sat separately from the group and appeared disinterested, while Culbert claims that he sat on the end because the other seats were filled. Culbert did not say anything inappropriate at the breakfast meeting.

On September 28, 2007, in a letter written from Gilreath to Culbert, Hilti terminated Culbert's employment. The termination letter did not identify any specific reason for Culbert's termination, but stated that Culbert would receive two

weeks pay in lieu of notice. Gilreath testified that he terminated Culbert's employment for several reasons, including insubordination, unwillingness to accept coaching, lack of improvement, disinterest in being a team player, and low sales. Gilreath relied entirely on Perchenko's description of Culbert's behavior.

For an involuntary termination, Hilti's written policy states that an employee will receive two weeks pay in lieu of notice, except where the employee is terminated "for cause." The policy defines "for cause" as, among other things, insubordination. Gilreath testified that even though Hilti terminated Culbert, in part, for his insubordination, Hilti did not consider the termination "for cause," so that Culbert would receive two weeks pay to help bridge his employment to his next job.

**Culbert's Complaint & Allegations of Discrimination**

On June 21, 2010, Culbert filed a complaint against Hilti, asserting claims of race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"), age discrimination under the Age Discrimination in Employment Act ("ADEA"), and retaliation under Section 1981.

Culbert alleges that, during his employment with Hilti, Perchenko discriminated against him based on his race and age. To support his allegations of race discrimination, Culbert testified that Perchenko made several racist comments. Specifically, Culbert claims that Perchenko commented about how African-American and Hispanic women maintain slim figures and return to work quickly

- 11 -

after giving birth. At her deposition, Perchenko testified that she made a comment about one specific Home Depot employee along the lines of "Oh, my gosh. I can't believe she's had a baby. She's so thin. If I had just had a baby, I would definitely not look like that." Culbert conceded that he had "no problem" with this comment.

Further, according to Culbert, on or about November 20, 2006, Culbert heard Perchenko speaking to a pro shop consultant in the North Avenue Pro Shop about the robbery of another pro shop. Perchenko told the other pro shop consultant, "yeah, if [Culbert] would just tell his relatives to bring the tools back, everything would be okay." After Culbert voiced his displeasure with the comment, Perchenko told Culbert, "Oh, I'm just kidding."

To support his allegations of age discrimination, Culbert also testified that Perchenko made numerous ageist statements. For instance, in a meeting, Perchenko allegedly identified Culbert as the oldest pro shop consultant. Perchenko recalled referring to Culbert as a "veteran." Additionally, Culbert testified that Perchenko repeatedly asked him when he was going to retire, though Perchenko did not recall using the word "retire." According to Perchenko, Culbert mentioned to her on several occasions that he was going to leave Hilti and that she responded, "Well, do you know when that's going to be? It would help me plan."

Further, according to Culbert, Perchenko asked him whether he paints his hair or plans to dye his hair and also told him that he was old, he was like her father, he

showed up to work each day because he was afraid that they would move the place if he did not come, he wore a hat to cover his gray hair, and she would hate to be his wife because they probably only sit at home since he is so old.

**Perchenko's Treatment of Other Employees**

Between March 1, 2006, and November 30, 2008, Perchenko issued a written warning and/or CAP to the following employees: Culbert (January 16, 2007, and June 13, 2007), Jeff Roberts ("Roberts") (April 25, 2007), Oscar Del Bosque (September 10, 2007), and Jodie Broderick (May 23, 2008). Perchenko issued a CAP to Roberts, a Caucasian in his thirties, for his poor sales performance and attitude with customers. According to Perchenko, Roberts immediately improved his attitude after receiving the CAP. Oscar Del Bosque and Jodie Broderick received CAPs for issues unrelated to their attitude.

On December 31, 2007, Joseph Thomas ("Thomas"), an African American, was transferred to Hilti's Midwest region to replace Culbert. Perchenko made the decision to hire Thomas as Culbert's replacement based on Thomas' friendliness and positive attitude and good recommendations from another Hilti store. According to Perchenko, Thomas was a good employee, although in his 2008 annual evaluation, she rated him as "below expectations" for his business targets. Thomas was located in the Elston store, which had attained 86.87% of planned sales. According to Perchenko, Thomas took the place of another consultant who worked in Elston for

the first three months of the year and exceeded planned sales the majority of the time. Perchenko thus believed that the other consultant was responsible for a large part of the sales. The record is unclear regarding Thomas's contribution to the Elston store's percentage of planned sales. On February 12, 2010, Thomas voluntarily ended his employment with Hilti.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Protective Life Ins. Co. v. Hansen*, 632 F.3d 388, 391-92 (7th Cir. 2011). A genuine issue of material fact exists when, based on the evidence, a reasonable jury could find in favor of the non-moving party. *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010). A court construes all facts and draws all reasonable inferences in favor of the non-moving party. *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009).

## DISCUSSION

## I.      Culbert's Discrimination Claims

Title VII, Section 1981, and the ADEA prohibit an employer from discharging or otherwise discriminating against an individual because of such individual's race or age. 42 U.S.C. § 2000e-2(a) (race); 42 U.S.C. § 1981 (race); 29 U.S.C. § 623(a)

- 14 -

(age). A plaintiff can prove discrimination through either the direct or indirect method. *Van Antwerp*, 627 F.3d at 297; *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008).

## A. Direct Method

Under the direct method, the plaintiff must present direct evidence of discrimination – an outright admission that an action was taken for discriminatory reasons – or circumstantial evidence that points to discriminatory animus. *Everett v. Cook Cnty.*, 655 F.3d 723, 729 (7th Cir. 2011). When offering circumstantial evidence, the plaintiff must present a "convincing mosaic" of evidence which points directly to a discriminatory reason for the employer's action. *Petts*, 534 F.3d at 720. Courts have recognized three types of circumstantial evidence. *Id.* First, the plaintiff can present evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other "bits and pieces" from which a jury can infer discriminatory intent. *Id.* at 721. Second, the plaintiff can present comparative evidence showing that similarly situated employees outside the protected class systematically received better treatment. *Id.* Third, the plaintiff can present evidence demonstrating that the employer's stated reason for the adverse action was merely a pretext for discrimination. *Id.* Culbert relies on all three

types of circumstantial evidence to demonstrate that Hilti terminated his employment because of his race and/or age.

First, Culbert points to statements made by Perchenko as evidence of discriminatory intent. A statement raises an inference of discrimination if it was made by a decision maker, or an individual exercising a significant degree of influence over the decision, around the time of the decision, and in reference to the adverse employment action. *Petts*, 534 F.3d at 721; *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 813 (7th Cir. 2007). Statements not satisfying this standard are non-actionable stray remarks. *Petts*, 534 F.3d at 721 (concluding that a statement, made more than a year before plaintiff's termination and unrelated to termination, was a stray remark that failed to prove the termination was motivated by discrimination). Hilti does not dispute the fact that any discriminatory animus by Perchenko was imputed to Gilreath, the decision maker, because Gilreath relied entirely on Perchenko's description of Culbert's behavior when deciding to terminate Culbert's employment.

Concerning his race, Culbert identifies two ambiguous statements made by Perchenko. First, in November 2006, Perchenko was referring to the robbery of another pro shop when she stated to another employee in front of Culbert, "yeah, if [Culbert] would just tell his relatives to bring the tools back, everything would be okay." As an initial matter, Perchenko's statement is facially race neutral. Even

- 16 -

assuming that Perchenko implied that the criminals were related to Culbert because he is African American, Perchenko made the statement in November 2006, nowhere near the time of Culbert's termination in September 2007, and the statement was wholly unrelated to his termination.  Perchenko's statement thus constitutes a non-actionable stray remark.

Second, Perchenko commented that African American and Hispanic women maintain slim figures and return to work quickly after giving birth.  Perchenko's statement relates to African American and Hispanic women having children and is entirely unrelated to Culbert's termination.  Thus, the statement constitutes a non-actionable stray remark and does not give rise to the inference that Perchenko recommended Culbert's termination because of his race.

Concerning his age, Culbert identifies numerous statements made by Perchenko.  According to Culbert, Perchenko repeatedly inquired about Culbert's retirement plans, identified Culbert as the oldest pro shop consultant, and told Culbert, among other things, that he was old, he was like her father, and he wore a hat to cover his gray hair.  Setting aside Perchenko's retirement inquiries, no inference of discrimination arises as to the remaining age-related statements because Culbert presents no evidence that Perchenko made those statements at or near the time of his termination or that Perchenko coupled those statements with a suggestion that Culbert should leave Hilti because of his age.  Moreover, statements merely

referencing "old" age, alone, do not point directly to a discriminatory reason for an adverse action. *Compare Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 695 (7th Cir. 2006) (finding that employer's repeated statements that plaintiff was "too old" was insufficient to prove that the employer terminated plaintiff's employment because of her age), *and Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000) (finding that statements like "old S.O.B" and "getting too old" amounted to conversational jabs in a social setting which did not evidence an intent to fire for an impermissible reason), *with Ezell v. Potter*, 400 F.3d 1041, 1051 (7th Cir. 2005) (holding that plaintiff presented sufficient evidence to defeat summary judgment where plaintiff's supervisors made comments about plaintiff's gray hair and had a plan to replace the older employees with younger employees).

The Court now turns to Perchenko's repeated inquiries about Culbert's retirement. Because Culbert testified that Perchenko repeatedly asked him about retirement, the Court draws the reasonable inference that Perchenko inquired about his retirement near the time she recommended his termination to Gilreath. As the Seventh Circuit noted in dicta, repeated references to retirement may permit a jury to infer age discrimination so long as the employee was adequately performing his job. *See Kaniff v. Allstate Ins. Co.*, 121 F.3d 258, 263 (7th Cir. 1997) (finding that suggestion of retirement, alone, did not give rise to inference of discrimination where suggestion was made to spare employee the embarrassment of being terminated for

dishonesty); *see also Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992) (holding that two inquiries about the employee's retirement shortly before the employee's termination was not direct evidence of age discrimination because the employer has a legitimate interest in learning its employees' plans for the future).

Hilti argues that Culbert was not adequately performing his job because Culbert was insubordinate and disrespectful to Perchenko. An insubordinate and disrespectful employee is not meeting the employer's legitimate expectations. *Everroad v. Scott Truck Sys,. Inc.*, 604 F.3d 471, 478 (7th Cir. 2010); *see also O'Neal v. City of Chi.*, 588 F.3d 406, 410 (7th Cir. 2009) (holding that plaintiff was not satisfying her employer's legitimate expectations because she failed to deny her insubordinate and confrontational behavior).

While Culbert disputes some of Perchenko's grounds for his alleged insubordination, Culbert admits to three acts of insubordinate or disrespectful behavior. First, in reference to his 2006 Review, Culbert admits that he told Perchenko, "just tell me what you want me to write on here and I will." Culbert conceded that Perchenko could find this statement insulting. Second, upon receiving the June 2007 CAP, Culbert admits that he raised his voice and used the word, "bullshit." Finally, during Perchenko's September 18, 2007 visit to the Armitage Pro Shop, Culbert admits telling Perchenko that he was not happy to see her because she probably had a write-up in her hand. Moreover, the Court cannot ignore the fact that

Culbert, in his 2006 Review, rated his own performance in all categories for the year as "below expectations." Because Perchenko first recommended Culbert's termination in June 2007, after at least one insubordinate act and his admittedly "below expectations" performance, Culbert cannot demonstrate under the direct method that he was meeting Hilti's legitimate expectations at the time of Perchenko's comments.

Second, Culbert argues that Perchenko systematically treated similarly situated non-African American employees, or younger employees, better than Culbert. Other employees are similarly situated to the plaintiff if they share a comparable set of failings. *Rodgers v. White*, 657 F.3d 511, 520-21 (7th Cir. 2011). The evidence reveals that Perchenko complained about Culbert's sales performance and attitude. According to the record, only Roberts, a Caucasian employee in his thirties, shared Culbert's combination of performance and attitude issues. Perchenko issued CAPs to both Culbert and Roberts for their subpar sales and attitudes. According to Perchenko, Roberts' attitude thereafter improved while Culbert's attitude did not. Perchenko's issuance of a CAP to Roberts, a non-African American employee who is younger than Culbert, demonstrates that Perchenko did not target Culbert because of his race or age. Because Roberts also received a CAP, no reasonable juror could conclude that Roberts received systematically better treatment. Even though Perchenko issued another CAP to Culbert in June 2007,

Culbert presents no evidence that Roberts' subsequent behavior warranted an additional CAP or that Perchenko failed to issue a CAP to any employee engaging in insubordinate or disrespectful behavior.

Finally, Culbert argues that Hilti's stated reasons for his termination were merely a pretext for discrimination. To establish pretext, the plaintiff must demonstrate that the employer's stated reasons are dishonest, and not merely inaccurate or poorly considered. *Everett*, 655 F.3d at 729. The plaintiff must prove that the employer's reason is not credible or factually baseless. *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010). Even though Culbert disputes the accuracy of some of his alleged wrongdoing, Culbert concedes that, on several occasions, he engaged in behavior which Perchenko found insubordinate or disrespectful. Hilti's decision not to formally terminate Culbert "for cause," so that he would receive two weeks pay in lieu of notice, does not undermine the evidence of his insubordination. Culbert thus presents insufficient evidence to establish that Hilti's stated reasons for his termination were merely a pretext for discrimination.

For the foregoing reasons, Culbert cannot prove a claim for race or age discrimination under the direct method.

**B.    Indirect Method**

Under the indirect method, a plaintiff establishes a prima facie case of discrimination by proving that he or she (1) belongs to a protected class, (2) was

satisfying the employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated worse than similarly situated employees outside the protected class. *Rodgers*, 657 F.3d at 517 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Once the plaintiff establishes a prima facie case, the defendant must then articulate a non-discriminatory reason for the adverse action. *Id*. If the defendant proffers a non-discriminatory reason, the plaintiff must prove that the stated reason is merely a pretext for discrimination. *Id.*

Hilti argues that Culbert has not presented evidence satisfying the second and fourth elements of his prima facie case. Culbert's circumstantial evidence under the direct method overlaps with his burden under the indirect method and this Court has already concluded that Culbert failed to demonstrate that he was satisfying Hilti's legitimate expectations or that Hilti treated Culbert worse than similarly situated employees outside the protected class. Moreover, even if Culbert could establish a prima facie case of discrimination, for the reasons stated above, Culbert could not demonstrate that the proffered reasons for his termination were merely a pretext for discrimination. Accordingly, Culbert cannot prove his discrimination claims under the indirect method.

## II.     Culbert's Retaliation Claim

Section 1981 also prohibits an employer from retaliating against an employee for opposing impermissible discrimination. *O'Leary v. Accretive Health, Inc.*, 657

F.3d 625, 630 (7th Cir. 2011). A plaintiff can establish a retaliation claim under either the direct or indirect method of proof. *Id.*

## A.     Direct Method

Under the direct method, the plaintiff must show that he or she engaged in a statutorily protected activity, that he or she suffered a materially adverse action by the employer, and the existence of a causal connection between the protected activity and the adverse action. *Id.*

Hilti argues that Culbert's retaliation claim fails under the direct method for two reasons. First, Hilti argues that Culbert did not engage in a statutorily protected activity.[2] However, an informal complaint of discrimination constitutes protected activity for purposes of a retaliation claim. *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 674 (7th Cir. 2011) (finding that plaintiff's comments to supervisor, that supervisor was treating the white subordinates more favorably than the African American subordinates, constituted protected activity). On September 18, 2007, Culbert accused Perchenko of having an issue with black people and said that the only solution was for him to "act more white." Perchenko responded that she would contact human resources if Culbert felt race was an issue and Culbert agreed that Perchenko should do so. Essentially, Culbert complained of Perchenko's

---

[2] Hilti waived this argument, which was made for the first time in its reply brief. *See U.S. v. Adamson*, 441 F.3d 513, 521 n.2 (7th Cir. 2006) ("Arguments made for the first time in a reply brief are waived"). Notwithstanding this fact, Hilti's argument lacks merit.

treatment of him based on his race and agreed that Perchenko should contact human resources regarding the issue. Culbert's informal complaint of discrimination thus qualifies as protected activity.

Second, Hilti argues that no causal connection exists between Culbert's complaint of discrimination and his termination. A plaintiff can establish the requisite causal nexus through direct evidence, like an admission by the employer, or through a convincing mosaic of circumstantial evidence that permits the inference that the employer retaliated against the plaintiff because he or she engaged in the protected activity. *O'Leary*, 657 F.3d at 630. Culbert first relies on the suspicious timing of his termination, which occurred ten days after his complaint of discrimination. However, suspicious timing alone rarely demonstrates that a complaint of discrimination caused the adverse employment action. *Id.* at 635. This is particularly true here, where Perchenko had recommended Culbert's termination in June 2007, several months before Culbert's complaint of discrimination. Additionally, once Culbert mentioned race as an issue, Perchenko properly suggested that she would contact human resources.

Culbert also argues that Perchenko treated Culbert worse than similarly situated employees not engaging in protected activity. As discussed above, no reasonable juror could conclude that Roberts, who did not engage in protected activity, received systematically better treatment because Perchenko also issued him

a CAP for his attitude. Additionally, Culbert fails to identify any other employee who engaged in insubordinate or disrespectful behavior. Culbert identifies other employees who were not disciplined for similar sales performance, but those employees fail to share the same set of failings as Culbert. *See, e.g., Rodgers*, 657 F.3d at 520-21 (finding that employee was not similarly situated because, unlike plaintiff, he was not accused of failing to enforce equipment policies).

Finally, Culbert argues that Hilti's stated reasons for his retaliation were merely a pretext for retaliation. Given Culbert's admittedly "below expectations" performance and acts of insubordination or disrespect, Culbert has failed to present evidence that the stated reasons were a pretext for retaliation.

## B. Indirect Method

Alternatively, under the indirect method, the plaintiff must establish a prima facie case by proving that he or she: (1) engaged in a statutorily protected activity; (2) was satisfying the employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in the statutorily protected activity. *O'Leary*, 657 F.3d at 635. Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a non-discriminatory reason for the adverse action. *Id.* If the defendant offers a non-discriminatory reason, then the plaintiff must demonstrate that the stated reason is pretextual. *Id.* For the reasons discussed above,

- 25 -

Culbert presents insufficient evidence to establish the second and fourth prongs of the prima facie case.  Moreover, even if Culbert could establish a prima facie case of retaliation, he could not demonstrate that the proffered reasons for his termination were merely a pretext for retaliation for the reasons stated above.  Accordingly, Culbert cannot prove his retaliation claim under the indirect method.

## CONCLUSION

For the foregoing reasons, this Court grants Hilti's motion for summary judgment.

Charles P. Kocoras
United States District Judge

Dated:  November 23, 2011